UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21cr11 DRL |
| KEITH WIGFALL, | |
| Defendant. | |

OPINION AND ORDER

Keith Wigfall pleaded guilty to possessing with the intent to distribute 500 grams or more of a methamphetamine mixture. *See* 21 U.S.C. § 841(a). He objects to the presentence report. Aside from other objections that will await sentencing, he says the two-level guideline enhancement for possessing a firearm violates the Second Amendment, particularly in light of the recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). It doesn't, so the court overrules this objection.

In 2021, law enforcement found fentanyl, cocaine base, and large amounts of cash in Mr. Wigfall's car, and later methamphetamine, fentanyl, marijuana, more cash, and tools of the drug trade in his home. Officers also discovered three loaded firearms in the home—one that had been reported stolen. The presentence report recommends a two-level enhancement because a dangerous weapon (a firearm) was possessed. U.S.S.G. § 2D1.1(b)(1).

This enhancement "reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1 app. n.11. It applies when a dangerous weapon is possessed, "unless it is clearly improbable that the weapon was connected with the offense." *Id.*; *see, e.g., United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2000). The government must demonstrate that Mr. Wigfall possessed the firearm—actually or constructively—then he must prove that it was clearly improbable that the firearm was used in connection with the drug offense. *See United States v. Cooper*, 767 F.3d 721, 732 (7th Cir. 2014);

*Harris*, 230 F.3d at 1057. Mr. Wigfall argues the facial unconstitutionality of this enhancement and the commentary's imposition of a burden on him at step two.

A facial challenge presupposes that "no application of the [guideline] could be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004). The government argues that Mr. Wigfall's facial challenge stumbles at the start because there are instances when this enhancement can be applied without a firearm and thus without implicating his Second Amendment concern. The enhancement applies to a "dangerous weapon"—not just a firearm. U.S.S.G. § 2D1.1(b)(1). A dangerous weapon means "an instrument capable of inflicting death or serious bodily injury," or an object closely resembling such an instrument or used in a manner to create the impression that it is such an instrument. U.S.S.G. § 1B1.1 app. n.1(E).

For instance, a drug trafficker could receive this enhancement if he carried a dagger as part of his dealing, *see United States v. Robtoy*, 848 F. Appx. 53, 54 (2d Cir. 2021), or a crossbow, *see United States v. Meadows*, 756 F. Appx. 631, 632 (7th Cir. 2019), or a box represented as a bomb, *see United States v. Hart*, 226 F.3d 602, 608 (7th Cir. 2000), or a box cutter, *see United States v. Commanche*, 421 F. Appx. 868, 869 (10th Cir. 2011), so long as the item qualified as a dangerous weapon or objectively created the impression of being one, *see United States v. Stitman*, 472 F.3d 983, 988 (7th Cir. 2007). The government contends that Mr. Wigfall cannot show the guideline would be unconstitutional in all respects, and that much is true.

A facial challenge traditionally has been described as "the most difficult challenge to mount successfully" because "the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Seeing this issue, Mr. Wigfall pivots slightly and refines his argument as a vagueness challenge, noting that he need not show the law in question to be vague in all its applications, not since *Johnson v. United States*, 576 U.S. 591, 602-03 (2015). And *Johnson* put this idea to rest to Mr. Wigfall's credit. *See United States v. Cook*, 914 F.3d 545, 553 (7th Cir. 2019), *vacated on other grounds*, 140 S. Ct. 41 (2019).

But his advance runs headlong then into a different roadblock—he cannot constitutionally raise a vagueness challenge to an advisory sentencing guideline. *See Beckles v. United States*, 580 U.S. 256, 262 (2017). The due process clause will invalidate two kinds of criminal laws as unconstitutionally vague: "laws that *define* criminal offenses and laws that *fix the permissible sentences* for criminal offenses." *Id.* The sentencing guidelines offer advice but never fix the permissible range of sentences. *See id.* at 263. "To the contrary, they merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." *Id.*; *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007). The guidelines neither "regulate the public by prohibiting any conduct" nor establish "minimum or maximum penalties for [any] crime." *Beckles*, 580 U.S. at 266 (quoting in part *Mistretta v. United States*, 488 U.S. 361, 396 (1989)). Whether another constitutional challenge may be tenable against the guidelines, this isn't one.

The court also must overrule the objection under *Bruen*. The first step is textual—whether the Second Amendment's plain text covers a person's conduct such that the Constitution presumptively protects it. *See Bruen*, 142 S. Ct. at 2126. The second step is historical—whether the government can justify its regulation consistent with our Nation's historical tradition of firearm regulation. *See id.* This step ensures that the regulation fits within the same historical context that lends meaning to the Second Amendment right to bear arms in the first place. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 592, 620-25 (2008); *see also Bruen*, 142 S. Ct. at 2127 ("government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms").

There is nothing truly new in *Bruen*. The text and its historical tradition are proven wayfinders to constitutional meaning, and nothing new. *Bruen* follows this very same convention from *Heller* and *McDonald*. *See Bruen*, 142 S. Ct. at 2128-29 ("*Heller*'s methodology centered on constitutional text and history"); *Heller*, 554 U.S. at 595 ("on the basis of both text and history, [] the Second Amendment conferred an individual right to keep and bear arms"); *see also id.* at 576, 592 (repeating same); *McDonald v. City of Chi.*, 561 U.S. 742, 767 (2010) (majority opinion) (examining text and history); *id.* at 785 (plurality

opinion) (noting that "judicial interest balancing" has been "expressly rejected"). And this convention emerges from an age-long tradition of interpretation. Nothing in *Bruen* changed *Heller*; one fortified the other. Only the rebirth of arguments is seemingly new, and the added scrutiny these arguments today give to firearm regulations.[1]

The Second Amendment plainly confers "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The text covers the same conduct that this sentencing guideline covers—possession of a firearm. The government and defendant present competing arguments whether the guideline is really a firearm regulation and whether Mr. Wigfall must be a law-abiding citizen to fall within the Second Amendment's protections. The court need not reach these issues today. *See also Range v. AG United States*, 2023 U.S. App. LEXIS 13972, 9-13 (3rd Cir. June 6, 2023) (*en banc*) (rejecting government's argument that "the people" includes only law-abiding citizens). The court will assume the Second Amendment applies and proceed directly to the historical analysis—a not uncommon practice. *See, e.g., White v. Illinois State Police*, 15 F.4th 801, 811 (7th Cir. 2021).

Historical study presents a clear answer. There is nothing novel about enhancing a sentence because a defendant possessed a firearm in the commission of a felony, much less in the guidelines recommending such an enhanced sentence. This has nothing to do with the person's status for constitutional analysis but the means by which he perpetrated the crime. The Second Amendment does

---

[1] *Bruen* upset a "means-end" scrutiny—that "one step too many"—that had developed only at the appellate level. *See Bruen*, 142 S. Ct. at 2127; *see, e.g., Ezell v. City of Chi.*, 651 F.3d 684, 701, 703 (7th Cir. 2011) (finding that *Heller* and *McDonald* "require[] a textual and historical inquiry into original meaning," and then adding the extra step of means-end scrutiny); *see also McDonald*, 561 U.S. at 785 (plurality opinion) ("In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."); *Miller v. Smith*, 2023 U.S. App. LEXIS 1506, 2 (7th Cir. Jan. 20, 2023) (saying *Bruen* made the constitutional standard "more explicit," but not new). That said, numerous cases challenged firearm regulations after *Heller* without need for further explanation in *Bruen*, so this is really a resurgence of arguments rather than something entirely new. *See, e.g., United States v. Luedtke*, 589 F. Supp.2d 1018, 1020 (E.D. Wis. 2008) (collecting cases about these same challenges post-*Heller* and pre-*Bruen*).

not give anyone the right to be armed while engaging in a felony or to have a firearm nearby to protect his drug stash or embolden his enterprise. "[T]here is no constitutional problem with separating guns from drugs." *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009).

Crimes historically have been subject to enhanced sentences because they were committed with firearms—true both just before and contemporaneous to the Second Amendment's ratification in 1791. In 1783, for instance, Connecticut punished robbery one way but punished an offender who committed this same crime with a firearm with death. *See* An Act for the Punishment of Burglary and Robbery, 1783 Conn. Pub. Acts 633 (*see* Figure 1). This fifth state of the original thirteen to ratify the Constitution long



**Figure 1**
**State of Connecticut Acts and Laws (1783)**

distinguished between common law robbery and armed robbery in measure of punishment. *See State v. Reed*, 254 A.2d 449, 451-52 (Conn. 1969).

In 1788, the Northwest Territory—a federal jurisdiction with laws enacted by a governor and three judges, all subject then to congressional approval, *see* An Ordinance for the Government of the Territory of the United States North West of the River Ohio (July 13, 1787), *reprinted in Documents*

5

*Illustrative of the Union of the American States, House Doc. No. 398, 69th Cong., 1st Sess.* (1927) (Northwest Ordinance)—punished breaking and entering more severely when a person was "armed with any dangerous weapon or weapons" by causing offenders to forfeit their estate and to face 40 years in gaol (jail), *see Laws Passed in the Territory of the United States, North-West of the River Ohio, from the Commencement of the Government to the 31st of December, 1791*, 20 (1792).[2] Federal legislation establishing the Mississippi Territory (later Alabama and Mississippi) based its governance on the Northwest Territory's model, and its earliest laws in 1799 and 1800—later known as the Sargent's Code based on the Federalist Governor Winthrop Sargent—increased punishment for both burglary and robbery when the culprit was armed with a dangerous weapon. *See* A Law Respecting Crimes and Punishments (Feb. 28, 1799), *reprinted in Sargent's Code: A Collection of the Original Laws of the Mississippi Territory Enacted 1799-1800: By Governor Winthrop Sargent and the Territorial Judges* 12-13 (1939) (*e.g.*, enhancing sentence for burglary with a dangerous weapon from three to four years); *see also* Michael H. Hoffheimer, *Murder and Manslaughter in Mississippi: Unintentional Killings*, 71 Miss. L. J. 35, 55 n. 47-48 (2001).

Not infrequently the colonies had laws to detain affrayers or disturbers of the peace until the offender could secure a surety. Translated to the colonies from the English common law, a surety was more preventative than after-the-fact punishment. A surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion that some crime [was] intended or likely to happen." 4 William Blackstone, *Commentaries on the Laws of England* 249 (1769); *accord United States v. Holden*, __ F. Supp.3d __, 2022 U.S. Dist. LEXIS 212835, 8 (N.D. Ind. Oct. 31, 2022) (citing *Bruen*, 142 S. Ct. at 2148). For instance, in 1759, New Hampshire persons "who shall go armed offensively" were not released "until he or she find such sureties of the peace and good behavior." *See* An Act for Establishing and Regulating Courts of Public Justice Within this Province (Oct. 16, 1759),

---

[2] This was a federal territory given that states such as Ohio did not come into being from this territory until 1803, and Indiana, Illinois, Michigan, and Wisconsin later still.

*reprinted in Acts and Laws of His Majesty's Province of New Hampshire, in New England*, 1-2 (1761). Massachusetts had a similar law in 1795 that prohibited riding or going offensively armed with a firearm "to the fear or terror of the good citizens of this Commonwealth," 1795 Mass. Acts and Laws 436, *reprinted in Laws of the Commonwealth of Massachusetts*, as did Virginia in 1736, *see Bruen* 142 S. Ct. at 2144.

Sometimes this surety system worked in the colonies; sometimes it didn't. New Jersey justices of the peace in the late 1700s also could demand sureties from those with implements to break into houses or those with weapons who intended to violate the law, but that safeguard was so ineffective that in 1799 New Jersey criminalized, as disorderly, weapon possession with the intent to assault a person. *See* An Act to Describe, Apprehend and Punish Disorderly Persons (June 10, 1799), *reprinted in Laws of the State of New Jersey* 474 (1821). Assault was one thing, but with a weapon such a person could be apprehended without a warrant and committed to a workhouse, not just asked for surety. *Id.* Maryland had a similar law for enhanced penalty as early as 1809. *See* An Act Concerning Crimes and Punishments (Nov. 1809), *reprinted in The Laws of Maryland, with The Charter, The Bill of Rights, The Constitution of the State, and Its Alterations, the Declaration of the Independence, and the Constitution of the United States, and Its Amendments* 465 (1811).

An 1805 statute in Massachusetts—with precursors into the 1700s—enhanced punishment whenever one of several aggravating circumstances existed, including possession of a weapon. *See Commonwealth v. Hope*, 39 Mass. 1, 9-10, 22 Pick 1 (Mass. 1839). "Burglary in the night time, if the person was armed with a dangerous weapon, was punished by death; if not armed, by hard labor for life; but if the offence was committed in the daytime, the penalty was less severe." *Id.* at 10.

As a continuation of this tradition and public understanding from the late 1700s, throughout the 1800s numerous states separately penalized or increased the severity of punishment for offenders who committed crimes with a weapon. *See United States v. Greeno*, 679 F.3d 510, 519-20 (6th Cir. 2012) (collecting cases), *overruled on other grounds*, *Bruen*, 142 S. Ct. at 2127; *see, e.g., United States v. Bernard*, 24 F. Cas. 1131, 1131, F. Cas. No. 14584, 2 Wheeler C.C. XLIV (N.J. 1819) (New Jersey treating possession

7

and use of a dangerous weapon to rob a postal carrier as a capital offense); Penal Code: Of Offenses Against the Persons of Individuals § 31, *reprinted in A Digest of the Laws of the State of Alabama* 416 (1843) (assault with a cowhide, stick, or whip, if the person possessed a "pistol or other deadly weapon, with the intent to intimidate and prevent the person so beaten from defending himself," was punished up to twenty years); *People v. Fellinger*, 24 How. Pr. 341, 342 (N.Y. Sup. Ct. 1862) (New York crime of burglary in first degree with dangerous weapon); *see also* 1880 S.C. Acts 448, An Act to Provide a Punishment for Carrying Any Deadly Weapon Concealed about the Person § 5 (1880) (punishing assault with a deadly weapon more severely—presiding judge "in addition to the punishment provided by law for such assault" could "inflict further punishment upon the person so convicted"); *State v. Cash*, 16 P. 144, 145 (Kan. 1887) (Kansas statute characterized first degree burglary as committed by a person armed with a dangerous weapon); *People v. Rockhill*, 26 N.Y.S. 222, 223-24, 74 Hun 241, 10 N.Y. Crim. R. 584 (N.Y. 1893) (New York statute defined first degree assault with the intent to kill with a loaded firearm or other deadly weapon); *State v. O'Neil*, 73 N.W. 1091, 1091 (Minn. 1898) (citing Minn. G.S. 1894 § 6482) (drawing distinction between third-degree robbery and first-degree robbery with a dangerous weapon under 1894 Minnesota statute). For instance, a pre-1876 Missouri statute enhanced punishment for burglary if it was aggravated, including with a dangerous weapon.[3] *See State v. Tutt*, 63 Mo. 595, 599 (Mo. 1876).

Though these laws, as they evolve later into the 1800s, become more attenuated from the Second Amendment's ratification, they, and particularly those before 1868, are rooted in the same national tradition and public understanding that existed at the time of its ratification—felonies committed with firearms could be punished more severely. *See Bruen*, 142 S. Ct. at 2138 (noting "ongoing scholarly debate" about whether courts should rely on the original understanding in 1791 or that prevailing in 1868 when

---

[3] Missouri law later required an indictment to charge this aggravator explicitly. *See State v. Young*, 133 S.W.2d 406-07 (Mo. 1939).

the Fourteenth Amendment was ratified, but observing that the same understanding on public carry laws existed in 1791 as 1868); *see also Heller*, 554 U.S. at 605.

One might argue that these laws required at times a specific intent, or one might say these weren't drug crimes; but drug use then was not the drug trade now, and the law "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. The law long has said that no one has a right to be armed while committing a felony "or even to have guns in the next room for emergency use should suppliers, customers, or the police threaten a dealer's stash." *Jackson*, 555 F.3d at 636 (addressing 18 U.S.C. § 924(c)). "[I]f Congress may forbid people who possess guns to deal drugs, it may forbid people who deal drugs to possess guns." *Id.* And, by extension, the sentencing guidelines may recommend greater punishment for drug dealers who possess firearms. *See United States v. King*, 333 F. Appx. 92, 96 (7th Cir. 2009) (district court's enhancement for possession of dangerous weapon under a similar U.S.S.G. § 2D1.11 "was not erroneous as long as there was some link between the conspiracy and the weapon").

*Jackson* and *King* upheld pleas or sentences against Second Amendment challenges after *Heller*, and their law remains as good now after *Bruen* as it did after *Heller*, particularly when the constitutional analysis has not changed. Mr. Wigfall invites the court to view these cases as infected by the means-end analysis that *Bruen* erased, but these decisions remain within the truest sense consistent with *Heller* and *Bruen*—on the precise point today—and elude any means-end analysis. Inklings of a gloss on the constitutional text and historical tradition would not come in this circuit until November 18, 2009, *see United States v. Skoien*, 587 F.3d 803, 808-16 (7th Cir. 2009), and means-ends analysis was not adopted until July 6, 2011, *see Ezell v. City of Chi.*, 651 F.3d 684, 701, 703 (7th Cir. 2011). Both *Jackson* (February 18, 2009) and *King* (June 3, 2009) stayed within *Heller*'s tradition, without discussion of or reliance on any additional gloss, and predated *Skoien* and *Ezell*. The court thus adheres to *Jackson* and *King* on this sentencing issue.

In short, under the Second Amendment, the sentencing guidelines may constitutionally recommend, and the court may impose, an enhanced sentence when an offender possesses a dangerous weapon, including a firearm, in the commission of another felony, specifically here under U.S.S.G. § 2D1.1(b)(1). This is quite within the historical tradition of enhanced punishment and consistent with the design of the guidelines to promote "reasonable uniformity" and "proportionality" by punishing more severe behavior with greater punishment. U.S.S.G. Ch. 1, Pt. A (noting that "a single category for robbery that included armed and unarmed robberies . . . would be far too broad").[4]

In reaching this result, the court stands in line with another district decision, though that case reached its conclusion by means of a slightly different analogue. *See United States v. Love*, __ F. Supp.3d __, 2022 U.S. Dist. LEXIS 229113, 9 (N.D. Ind. Dec. 20, 2022). The government has the burden to prove an historical analogue, so judges must evaluate what they're given. The court finds *Love*'s historical analysis of laws that would prohibit the carrying of firearms to breach the peace or terrorize the public to be cogent, and consistent support of today's decision, though the tradition of enhanced sentences may serve the closer analogue to this guideline issue. *See also United States v. Alaniz*, __ F.4th __, 2023 U.S. App. LEXIS 14678, 9 (9th Cir. June 13, 2023) (using both); *United States v. Burgess*, 2023 U.S. App. LEXIS 823, 14 (6th Cir. Jan. 13, 2023) (two-level enhancement "consistent with the historical understanding of the right to keep and bear arms"); *United States v. Napolitan*, 762 F.3d 297, 311 (3rd Cir. 2014) (neither Second Amendment nor *Heller* "entitle a drug trafficker to carry a firearm in furtherance of his criminal exploits"). Mr. Wigfall cites no cases that have ruled his way, and tellingly the court finds none.

That leaves one issue for decision: whether the burden-shifting in § 2D1.1 is problematic. It isn't. Mr. Wigfall argues that the court should disregard the guideline commentary because it too violates the

---

[4] In addition to treating offenses differently, whether armed or not, the guidelines recommend two-level enhancements for possessing a dangerous weapon in connection with crimes for drugs, burglary, trespass, counterfeiting, credit extortion, and smuggling an unlawful alien. *See* U.S.S.G. §§ 2D1.1(b)(1), 2D1.11(b)(1), 2B2.1(b)(4), 2B2.3(b)(2), 2B5.1(b)(4), 2E2.1(b)(1)(C), 2L1.1(b)(5)(C).

Second Amendment, aside from being in his view internally inconsistent. The commentary says the "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) app. n.11(A). Mr. Wigfall argues that the jump from the *possession* requirement in the guideline text to mere *presence* in the commentary violates the Second Amendment.

The court applies the guideline as plainly written. *See United States v. Severson*, 569 F.3d 683, 691 (7th Cir. 2009). The "application notes are *interpretations of*, not *additions to*, the [g]uidelines themselves; an application note has no *independent* force." *United States v. Rollins*, 836 F.3d 737, 742 (7th Cir. 2016). Commentary that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute or proves inconsistent with the guideline's text. *See Stinson v. United States*, 508 U.S. 36, 38 (1993); *United States v. Hill*, 563 F.3d 572, 581 (7th Cir. 2009). Whatever worry about the commentary, the law requires firearm possession, not mere presence, for this enhancement to apply. *See United States v. Ford*, 22 F.4th 687, 692 (7th Cir. 2022) ("government must establish by a preponderance of the evidence that the defendant possessed the weapon, either actually or constructively"). That addresses one point. And requiring possession and not mere presence avoids punishing wholly passive behavior. *See United States v. Schnell*, 982 F.2d 216, 221 (7th Cir. 1992).

Only with proven possession must Mr. Wigfall show that it is clearly improbable that the weapon was connected with the offense. There is nothing unconstitutional about this advisory guideline placing this burden on the defendant—not after the government has proven its historical tradition of enhanced sentences and proven firearm possession. In this process of calculating the recommended guideline range, the law occasionally imposes a burden on the defendant. For instance, a defendant must furnish "some evidence" to challenge the reliability of facts within a presentence investigation report, *see United States v. Moore*, 52 F.4th 697, 701 (7th Cir. 2022), or to trigger certain guidelines, *see, e.g.,* U.S.S.G. § 3B1.2 (minor role reduction); *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993) (burden on defendant), or to qualify

for the safety valve, *see* 18 U.S.C. § 3553(f); U.S.S.G. §§ 2D1.1(b)(18), 2D1.11(b)(6), 5C1.2; *United States v. Arrington*, 73 F.3d 144, 148 (7th Cir. 1996) (burden on defendant). Shifting the burden alone isn't constitutionally inimical to reaching a recommended sentence; and punishing firearm possession in connection with drugs and tools of the trade reflects the same increased danger of violence that is consistent with the historical tradition of punishing firearm possession in connection with the commission of another felony more severely. *See supra*; *see also United States v. Jones*, 56 F.4th 455, 502 (7th Cir. 2022) (discussing this rationale for § 2D1.1(b)(1)).

Mr. Wigfall possessed three firearms in his home. He had a loaded pistol in a box with many pills in the kitchen as well as methamphetamine, crack cocaine, and tools of the drug trade in that same room. He kept a loaded revolver in the basement with two safes containing $30,065.00. And he had a loaded .22 caliber Cobra derringer with his drug ledger in the master bedroom. He was using his home as a base for dealing. "Guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking offense." *United States v. Grimm*, 170 F.3d 760, 767 (7th Cir. 1999); *see also United States v. Thurman*, 889 F.3d 356, 372 (7th Cir. 2018) (enhancement applied when gun kept in close proximity to a safe with ostensible drug money); *United States v. Rea*, 621 F.3d 595, 606-07 (7th Cir. 2010) (enhancement applied when defendant had three firearms in house, and large amounts of cash and a scale in separate rooms, though no drugs). These facts preponderantly show the connection of these firearms to Mr. Wigfall's drug activity and his emboldened trade. There is no Second Amendment problem here, nor issue with utilizing this enhancement under the guidelines.

## CONCLUSION

The court OVERRULES Mr. Wigfall's objection to the dangerous weapons enhancement, finding that the enhancement does not violate the Second Amendment. The court GRANTS Mr. Wigfall's first motion for leave to file supplemental authority [ECF 72]. The court will set a sentencing hearing by separate order.

SO ORDERED.

June 15, 2023                                         *s/ Damon R. Leichty*
                                                      Judge, United States District Court